## ALABAMA GREAT SOUTHERN RAILWAY CO. v. S. J. HALE.

Eastern Section. October 29, 1932.

Writ of Certiorari denied by Supreme Court, January 7, 1933.

Lynch & Bachman and Phillips & Lynch, all of Chattanooga, attorneys for plaintiff in error.

Tatum, Anderson & Tatum, all of Chattanooga, attorneys for defendant in error.

R. B. CASSELL, Sp. J. Suit by S. J. Hale against the Alabama Great Southern Railway Company for $15,000 damages and the cause of action substantially is this:

That in November, 1930, and prior thereto, defendant was a railway engaged in Interstate Commerce, and a common carrier by freight and passengers; that it had in its employ many section crews consisting of section and bridge foremen and a gang of men working under the section foremen; that it was the duty of these crews to keep the track, road bed and bridge in repair. That the plaintiff was an employee of the railroad in a section gang in Dade County, Georgia, working on the line southwardly a distance of six or seven miles, under one, J. M. Hopper, as foreman; that on the date mentioned plaintiff was ordered by Hopper, along with other employees of said crew to board the motor car furnished by the railroad and proceed southwardly to a destination unannounced by said Hopper. That at the time of the accident a heavy fog made it impossible for the foreman, who operated the car, or anyone else, to see but a short distance ahead. On reaching a place about five miles south of Trenton, the motor car, on which the plaintiff was riding, had a head-on collision with a similar motor car of the defendant, which was being operated northwardly on said railway track by one of defendant's bridge foremen or a member of the bridge crew under the direction of said foreman; both of the foremen were the agents and employees of the defendant, and both of said cars were running at a fast and rapid speed when they came together with great force and violence which severely and permanently injured the plaintiff. That the plaintiff suffered severe bodily injuries, among which were injuries to the bones of his foot, and these injuries caused him to be confined at a hospital and at his home for a long space of time, said injuries causing his limb to be deformed and making him lose much time and suffer great physical pain and mental anguish. It is further averred that there were in effect, at the time of the injury, certain rules, promulgated by the Railway Company, governing the operation of motor cars,

which required the foreman in charge to use all necessary precautions to protect the motor cars and employees riding thereon from colliding with trains or other motor cars. Among other duties imposed upon the foreman by said rules was that the car should be operated by the foreman in charge, who, when possible, must secure written information from the train dispatcher, as to the location of trains that might affect the movement of the motor car, and also that he secure other information and take such other precautions as might be necessary for the safe operation of the motor car. The rules further provided that when the view was obstructed by fog or curvature of the track, the movement must be protected by a flagman with proper signals, the proper use of signals likewise being defined by rules of the railway.

It is further averred that at the time aforesaid the foremen operated both of said motor cars in a negligent manner in that they were operated at a fast, reckless and dangerous rate of speed when neither of the operators could see but a short distance ahead on account of the heavy fog, and that neither foreman kept the motor cars under proper control or kept a lookout ahead for other motor cars rightfully in use of the track when they saw or could have seen the approach of the other car, that neither of them applied the brakes and brought their respective cars to a stop or slacked in speed in order to prevent a collision of said motor cars. It is further averred that the Railway Company was negligent in the operation of both of said cars when they violated the rules as heretofore averred; neither of the foremen secured written information from the train dispatcher as to the location of trains or motor cars which might affect the movement of their motor cars nor did they take any precaution for the safe operation of said motor cars by protecting the operation of either of the cars by a flagman with proper signals when the view of each foreman was obstructed on account of the heavy fog. It is further averred that at the time of the accident the plaintiff was in the line and in discharge of his duties as an employee of his Company and engaged in Interstate Commerce. It is further averred that the negligence of the defendant, its agents and employees was the direct and proximate cause of injuries to the plaintiff.

The defendant plead the general issue and the case was heard by the Circuit Judge and the jury, but before the case was finished and after plaintiff's evidence was introduced, defendant made a motion before the Circuit Judge to peremptorily instruct the jury to bring in a verdict for the defendant, which was overruled by the trial judge and case submitted to a jury, and a verdict of $4000 entered in favor of the plaintiff.

Defendant moved for a new trial and submitted three assignments of error showing why the verdict of the jury should be set aside and a new trial granted. These assignments were as follows:

1. Because there was no evidence to sustain the allegations in the plaintiff's declaration.

2. Because the undisputed evidence shows that the negligence complained of in the declaration was not the proximate cause of the accident.

3. Because the undisputed evidence shows that the plaintiff should have known and did know the facts alleged in the declaration and shown in the testimony, which shows negligence on the part of the defendant company and which facts the plaintiff is presumed to know or presumed to have known and that he did know and appreciate the danger and risk involved, the plaintiff being an experienced railroad man, and that he assumed the risk.

Motion for a new trial was overruled by the trial judge and appeal taken to this Court. The evidence in the case shows beyond question a serious and permanent injury to the plaintiff and no question is raised as to the amount of the damage, in fact, the Court understands this is undisputed by the defendant and it is not assigned as an error that the verdict of the jury was excessive.

As to the cause of the injury the plaintiff is the only witness who testifies in the case. Substantially his testimony is as follows:

That he was fifty years old; had been working for the railroad on section No. 3 since November, 1930, as a member of the section crew repairing the tracks on the Trenton, Georgia, section; that this section started from Trenton and ran south six miles towards Meridian, Mississippi; that this railroad runs through Tennessee, Georgia and Alabama and that it is engaged in Interstate Commerce; that on the morning in question he went to work as usual at 7:00 A. M. and along with other employees was directed by Hopper, the foreman, to roll the four wheel motor car onto the track, head it south, and get on the car; that the foreman operated it as usual, that it was propelled by gasoline; that after proceeding south about two miles the foreman stopped the car and the plaintiff, with other members of the crew, some five or six altogether, did some work on the track, which consumed fifteen or twenty minutes, and then under the direction of the foreman proceed further south, the foreman still operating the car. The foreman did not tell them where they were going, but continued to run the car as usual southward; that it was "awfully foggy," so foggy that you could not see ahead more than four rail lengths of about 39 feet each; that it was an unusually heavy fog, and that it was more dense than he had witnessed any morning during his employment; that there were lamps on the car, but they

were not lit. Plaintiff further testified that he had never seen the contents of the rule books governing the operation of motor cars; that such rules were never furnished him or members of the section crew; that he does not know what, if anything, the foreman did that morning to see if there were any trains coming but he thinks that the foreman called the dispatcher of Birmingham, as was the custom; he does not know what was done that particular morning towards getting a line up on the trains and that he was riding on the rear end of the car in a sitting position facing the west side of the track and that he had no duty to perform while the car was running, except to see that tools were so placed that they did not fall off. The operator of the motor car was facing south, the direction the car was going, when the car on which he was riding had a head-on collision with another motor car operated by another of the defendant's foremen. This last car was used by a bridge gang; this collision happened about five miles south of Trenton; that at the time of the collision the car on which the plaintiff was riding was running about the usual rate of speed—30 to 35 miles per hour—and that he saw the approaching motor car when they were two rails apart and just a second before they came together. Again the plaintiff testified that when he saw the car he jumped from the car on the ground on the side of the track and was injured the extent of the injury being as above shown. He does not know whether any of the others jumped or not, but the foreman was thrown on the other side of the track and killed and the foreman on the other car, likewise, was killed, the result of this collision. Witness further says that the cars came together with great force and at the time the fog was very heavy and had continued all of the way from the time he began work; that the other car had no light, neither was there anyone to flag it in any way. Witness further testifies as to extent of his injuries, which substantially had been stated by the surgeon, and which has heretofore been set out in this opinion, that at the time of the injury he was earning $2.64 per day and had worked regularly until that time, but now cannot do anything which requires any physical labor or exertion. Witness does not know how many of the crew jumped off, but the foreman stayed on and was killed. At the time of the injury, witness stated that he was not looking forward but was looking towards the west, also looking forward some, sometimes he would look forward and sometimes he would look to the west. Witness further said that nothing was said by anybody about the speed the car was running, but if the brakes were all right and the rails were dry a car of this kind could be stopped in four or five rail lengths; that that morning the rails were wet and it was more difficult to stop and it would require a longer space to stop in; that

he had worked for the railroad twenty years and on that section about a year, and was an experienced section man. Witness further states that if he had been looking ahead just prior to the accident he could not have seen the car any quicker than he did, and while he was not specially looking ahead, if anything had been on the track he could have seen it. He also says he does not think the man operating the car could see the approaching car any quicker than he could see it himself. He further states that he does not think anything could have stopped the cars in time to prevent an accident, running as they were, and he did not know anything about the other car approaching or about its speed, except that he did not believe it was running as fast as the one he was on.

By agreement, the rules of the Company were put in evidence and they are as follows:

### "USE AND OPERATION OF MOTOR, HAND, PUSH AND VELOCIPEDE CARS

"1. Each car will be assigned to the one who is to use it and the user is charged with the responsibility for its proper and safe use, operation, care and maintenance, except that when a conductor is assigned to a car he is responsible for its safe operation. The presence on the car of an officer of the Railway, of any rank, does not relieve the user his prescribed responsibility but such officer shall reasonably satisfy himself that safe operation is being maintained. When the Superintendent, Assistant Superintendent, Trainmaster or Assistant Trainmaster, is on the car, such officer will be in charge and responsible for the safe operation of car.

"2. A car must not be operated on the tracks of the Railway Company except when in charge of the user or another who is designated by the user. No one shall use a car until he has passed the required examinations and is qualified. A car must not be used except for business of the Railway Company.

"3. No one except officers of the Railway, and employees in the discharge of their duties, will be permitted on cars unless authorized by proper officer.

"4. Warning signals such as gong, whistle or other device must be sounded by the user of a car so equipped when approaching crossings at grade and at other places when necessary to warn the public or workmen of the approach of the car. The car must be stopped when necessary to avoid striking vehicles, persons or animals.

"5. The user of a car, working within restricted limits, before starting to or returning from work, or while the car is on main track, must take proper measures for safety, obtaining information

in writing from train dispatcher when possible as to location of trains in that territory.

"6. A car which cannot be quickly removed from the track must be operated under train orders or under the protection of a flagman with proper signals.

"7. A car which can be quickly removed from the track by those on the car, may be operated under the responsibility of the user, who must when possible secure written information from the train dispatcher as to location of trains that may affect the movement of the car and secure additional information from time to time, and take such other precautions as may be necessary for safe operation. The information from the train dispatcher does not relieve the user of his responsibility for safe operation.

"7. The user of a car must have in his possession copy of current time table and a standard watch with correct time. He must observe passing trains for signals displayed. He must observe the indication of block signals but they do not relieve him of responsibility for safe operation. He must assign one or more employees, when available, to keep vigilant lookout in both directions for trains, other cars and for persons, vehicles, animals or other obstructions, and assign station and duties to each person to be followed when removing the car. When the view is obstructed by fog or curvature or when other adverse conditions prevail the movement must, if necessary, be protected according to Rule 99 by a flagman with proper signals.

"8. The user of a car must exercise due caution when running alongside a moving train, reducing speed and keeping lookout for swinging car doors or other protruding objects. He must stop the car when necessary to avoid accident or injury. Especial care must be used when meeting or passing a train on a curve and if necessary the occupants must alight and stand clear of all tracks.

"9. The speed of a car must not exceed the following:

Hand Cars _____10 miles per hour
Motor Cars _____30 miles per hour"

MR. TATUM: I will now read Rule 99 for the government of trains, as follows:

"99. When a train stops under circumstances in which it may be overtaken by another train, the flagman must go back immediately with flagman's signals a sufficient distance to insure full protection (not less than one-half mile further on descending grades or when view is obstructed) placing two torpedoes, one rail length apart, on the rail on engineman's side of track, and when necessary, in addition, display a lighted fusee.

"When signal 14 (d) or (3) has been given to the flagman and safety to the train will permit, he may return. When the conditions require he will leave the torpedoes and a lighted fusee.

"The front of the train must be protected when necessary by the front brakeman or baggagemen, if available, otherwise by the fireman.

"When a train is moving under circumstances in which it may be overtaken by another train, the flagman must take such action as may be necessary to insure full protection. By night, or by day when the view is obstructed, lighted fusees must be thrown off at proper intervals.

"When day signals cannot be plainly seen, owing to weather or other conditions, night signals must also be used.

"Conductors and enginemen are responsible for the protection of their trains.

"Flagman's Signals ____A red flag, torpedoes and fusees.

"Night Signals____A red light, a white light, torpedoes and fusees."

The witness was then recalled and stated that the bridge crew occasionally came up into their section, but that he never knew when to expect them, and that motor cars were not referred to as trains.

The assignments of error, being three in number, raise two questions.

First: That there was no evidence to sustain the allegations in the plaintiff's declaration.

Second: That the negligence complained of was not the proximate cause of the accident.

We will consider these two assignments as raising one question and that is—was there any evidence to support the jury's verdict? In considering the assignments, we will first consider a question raised by the plaintiff in error in their brief to the effect that there was clear-cut variance between the averments in the declaration and the evidence submitted, that is to say, the plaintiff stated in the declaration that he was injured by a collision of the motor car on which he was riding, with another motor car of the defendant, whereas the evidence shows that he was injured by jumping off of the motor car before the collision occurred.

We have examined the record and law and do not think that there is such a material variance as really amounts to anything or that would be fatal to plaintiff's suit. The declaration sets out that the plaintiff was injured in a collision between two of defendant's motor cars, and strictly speaking that is not true, because he was not on the motor car when he was injured but a few seconds prior to the accident had jumped from the motor car on which he was riding knowing that probably he would be killed if he stayed on the car when it was struck by the other one.

Our Courts have uniformly held that under such conditions a party being placed in sudden peril is not to be held responsible for a mistake

in judgment and especially is this true in case at bar as it is shown that he acted wisely by jumping because if he had remained on the car he would have more than likely been killed as was his foreman. Again, we think that the proof, under the allegations of the declaration, that he was hurt by jumping off of the car, shows that this act was so connected with the collision between the cars, that he would be entitled to prove how he was injured even tho it was by jumping from the car which was almost an act occurring simultaneously with the collision under an allegation of the declaration that he was injured by the collision. We see nothing in the cases of East Tennessee Coal Co. v. Daniel, 100 Tenn., 65, 42 S. W., 1062, and Railroad v. Lindamood, 111 Tenn., 457, 78 S. W., 99, which conflicts with this view. We therefore hold that such a variance is not a material one.

We think the case presented is one where the employee was called upon to assume an extraordinary risk due to the fact that under the rules of the railroad company, and under the law, this employee had the right to assume that the railroad company would protect him in the discharge of his duties as a section man by not running another motor car into his motor car on this section of the railroad without notices. The running of a motor car by a bridge gang was not an usual or everyday occurrence, but, as the proof clearly shows, an occurrence which might not happen more than one or twice in three months, and when it did happen we think the plaintiff had a right to depend on the observance of the rule which required the railroad company, through its agents and vice-principals, to protect the employee against unusual and extraordinary occurrences, that is to say, against motor cars running in the manner and at a time that the motor car by the bridge gang was run. There was no way for the employee to discover that there was a motor car run by a bridge gang approaching which would collide with his car; he did not know the rules of the railroad and if he had known them such rules would not have protected him on account of the foreman failing to have the dispatcher at Birmingham communicate the fact that such a motor car was coming so that a collision could have been avoided. If he had known of such failure to observe, he could have refused to continue in employment. The risks that he was called upon to assume were extraordinary for another reason, that is, that both cars were run by their foremen in violation of the rule which required an employee of the railroad to go in front of the car as flagman so as to give warning of its approach. In other words, the violation of these rules made it an extraordinary risk, under the law as we understand it, and under the rules of the road. To hold otherwise would be to say that the Employers' Liability Act, under which this suit was brought, does not afford any protection to the employee in any instance; we do not

believe that Congress so intended, neither do we believe that a fair interpretation of the decisions of the Supreme Court of the United States and of Tennessee justifies such a conclusion.

Proceeding now to an examination of the authorities we submit the following to justify our conclusion. In the case of Read, Administratrix, v. Director General of Railways, 258 U. S., 93, 66 Law Ed., 480, opinion by Mr. Justice McReynolds the Court held as follows:

"Accepting the view that the engineer's negligence was the proximate cause of the fatal injury, the court below held the decedent had assumed the risk of such negligence and the master was not liable; citing, among other cases, Seaboard Air Line R. Co. v. Horton, 233 U. S., 492, 58 L. Ed., 1062, L. R. A., 1915C, 1, 34 Sup. Ct. Rep., 635, Ann. Cas., 1915B, 475, 8 N. C. C. A., 834. This, we think, was error.

"Seaboard Air Line R. Co. v. Horton—often followed—ruled that the Federal Employers' Liability Act did not wholly abolish the defense of assumption of risk as recognized and applied at common law. But the opinion distinctly states that the first section 'has the effect of abolishing in this class of cases the common-law rule that exempted the employer from responsibility for the negligence of a fellow employee of the plaintiff.' The Second Employers' Liability Cases (Mondou v. New York, N. H. & H. R. Co.), 223 U. S., 1, 49, 56 L. Ed., 327, 345, 38 L. R. A. (N. S.), 44, 32 Sup. Ct. Rep., 169, 1 N. C. C. A., 875, declared that 'the rule that the negligence of one employee, resulting in injury to another, was not to be attributed to their common employer, is displaced by a rule imposing upon the employer responsibility for such an injury, as was done at common law when the injured person was not an employee.' And in Chicago, R. I. & P. R. Co. v. Ward, 252 U. S., 18, 64 L. Ed., 430, 40 Sup. Ct. Rep., 275, we said: 'The Federal Employers' Liability Act places a co-employee's negligence, when it is the ground of the action, in the same relation as that of the employer upon the matter of assumption of risk.' See New York C. & H. R. R. Co. v. Carr, 238 U. S., 260, 59 L. Ed., 1298, 35 Sup. Ct. Rep., 780, 9 N. C. C. A., 1; Chesapeake & O. R. Co. v. DeAtley, 241 U. S., 310, 313, 60 L. Ed., 1016, 1019, 36 Sup. Ct. Rep., 564.

In actions under the Federal Act, the doctrine of assumption of risk certainly has no application when the negligence of a fellow servant, which the injured party could not have foreseen or expected, is the sole, direct, and immediate cause of the injury. To hold otherwise would conflict with the declaration of Congress that every common carrier by railroad, while engaging in interstate commerce, shall be liable to the personal representative of any employee killed while employed therein, when death results from the negligence of any of

the officers, agents, or employees of such carriers.''

Counsel for both parties cite the case of C. N. O. & T. P. Railway v. Brown, 158 Tenn., 75, 12 S. W. (2d), 381, as sustaining their contentions. This was an opinion by His Honor Chief Justice Green and from a careful reading of the case, we do not find anything therein that conflicts with this opinion; on the contrary, we are satisfied that the Court in using the following language—''there was nothing extraordinary in the manner of the operation of the train which killed Brown. If such operation be regarded as negligent, nevertheless, under all the proof, it was the usual and customary operation of such trains at such point, with which Brown's long experience had made him familiar, and he assumed the risk from which he met his death,''— meant to hold and in substance did hold that if the train which killed Brown was operated in an extraordinary manner the Company would have been liable, but, as stated above, the train which killed Brown was operated in the usual and customary manner and that Brown's long experience had made him familiar, and he assumed the risk from which he met his death.

Mr. Justice Green construes in the above case, the case of Chesapeake & Ohio Railway Co. v. Nixon, 271 U. S., 218, 70 L. Ed., 914, and reaches the conclusion, as we understand it, on the question of liability when the risk is an ordinary one. Notwithstanding the fact that Hale had been in the service of the Company for several years, and might have been considered an experienced employee, there was no danger that was so obvious that he might have anticipated it, and thus avoid the accident. It is shown in the record that he jumped just as soon as he discovered the danger, in an attempt to avoid losing his life, this he did at his first opportunity to discern the danger.

The cases cited in the brief for the plaintiff in error, which hold that an employee assumes the risk of the negligence of his fellow employees, do not hold—as we understand them—that an employee of a Railroad Company assumes the risk of the negligence of one of the Railway Company's superior officers or agent. In the instant case, the injury to the plaintiff was certainly caused by the negligence of his superior officer. We do not think the cases cited by the plaintiff in error extend the doctrine of assumption of risk under the Employers' Liability Act to injuries arising from extraordinary dangers which are not apparent.

The other assignment of plaintiff in error is disposed of by the conclusion reached and need not be discussed.

For the above reasons stated, we are of the opinion that there is no error in the decision of the lower court and it is affirmed.

Portrum and Thompson, JJ., concur.